465 So.2d 594 (1985)
GIRDLEY CONSTRUCTION COMPANY and Associated Industries of Florida, Appellants,
v.
Bert OHMSTEDE (Deceased) and Mrs. Bert Ohmstede, Appellees.
No. AX-7.
District Court of Appeal of Florida, First District.
March 19, 1985.
*595 F. Bradley Hassell of Smalbein, Eubank, Johnson, Rosier & Bussey, Daytona Beach, for appellants.
Mark A. Olewinski, Lake Mary, for appellees.

AS CORRECTED ON DENIAL OF REHEARING
THOMPSON, Judge.
The employer and carrier appeal an order finding that the employee's death was a result of an accident which arose out of and in the course of his employment and awarding his widow death benefits. We reverse.
The decedent, a construction foreman, sustained a compensable injury when he struck his head on a two-by-four. One fellow employee testified that immediately after the accident the decedent did not complain of injury and continued working. Another fellow employee testified that following the accident the decedent had an abrasion on his left forehead above the eye and an abrasion on his left cheek. The decedent's widow testified that when her husband returned home on the evening of the day of the accident, he appeared distraught and tired, and had tears in his eyes. She said he had an abrasion on the right side of his forehead that looked like a severe wood burn. He had little appetite, was listless and seemed to have problems with his balance, memory and coordination, and these problems seemed to worsen over the weekend. She last saw her husband on the night of February 20. On the afternoon of February 21, a witness traveling south on Interstate 95 saw the decedent step over a guardrail, and without looking, walk into the path of an oncoming truck. The impact resulted in his death a few minutes later.
Although there was evidence of unusual or peculiar actions by the decedent subsequent to his industrial accident, there was also evidence of unusual or peculiar actions by the decedent prior to the accident. One fellow employee testified that during the two months before the accident he observed the decedent crying and twisting his hands and that the decedent would give no explanation for his strange actions. Dr. Botting testified that the deceased had a history of bizarre behavior. There was also testimony that the decedent had domestic problems that resulted in emotional stress prior to the accident.
The medical examiner who performed the autopsy testified that there were several possibilities that could have combined to cause the fatal accident. The possibilities were that the decedent's subdural hematoma could have been caused by the accident, that the subdural hematoma could have resulted in confusion and some sort of neurological impairment, and that the mental impairment could have caused decedent to walk in front of the truck. He stated that the degree of hemorrhage was not very great but could not say that there was more than a mere medical possibility that the blows to the head of the decedent caused his subdural hematoma. Neither could he say within a reasonable medical probability that the blow to decedent's head on Friday had caused him to walk into the path of the truck three days later.
Circumstantial evidence may be relied on in a civil case to prove an essential fact, but the particular inference of the existence of the fact relied upon must outweigh *596 all contrary inferences that might be drawn from the same circumstances. Furthermore, an inference upon an inference may not be relied on to establish an essential fact unless the original inference can be elevated to the dignity of an established fact because of the absence of any reasonable inference to the contrary. Voelker v. Combined Insurance Company of America, 73 So.2d 403 (Fla. 1954); Commercial Credit Corporation v. Varn, 108 So.2d 638 (Fla. 1959). In reaching his conclusion that the decedent sustained an accident arising out of and in the course of his employment, the deputy relied initially upon an inference that the accident caused the subdural hematoma, upon a further inference that the subdural hematoma led to some physical and mental impairment, and upon the still further inference that the physical and mental impairment caused the decedent to walk in front of the truck some three days later. This was an impermissible stacking of inference upon inference.
REVERSED.
SMITH, J., concurs.
BOOTH, J., dissents.
BOOTH, Judge, dissenting:
I respectfully dissent. The order below should be affirmed since it is based on competent, substantial evidence. The evidence in the instant case is that the decedent suffered a probable brain injury on the job, followed by unusual behavior prior to his fatal accident, behavior which included headache, listlessness, nausea, loss of appetite, trouble in reaching and judging distance of and grasping objects, and forgetfulness. The autopsy showed a subdural hematoma of less extent and milder than the massive head injuries from the subsequent fatal accident, which further supports the order of the deputy. Medical testimony with regard to symptoms and conduct, as outlined above, exhibited by decedent prior to his fatal accident, was in part as follows:
A. [Dr. Schwartz] The description given by you is very characteristic of an injury resulting in a subdural hematoma with the attendant symptoms as described by you.
... .
Q. Is one of the symptoms of a subdural hematoma a difficulty with perception, visual perception?
A. Yes, sir.
The symptoms are manifold depending on the degree of pressure on the vein and the particular location of the hemorrhage.
... .
The symptoms are usually more generally headache, listlessness, confusion.
Further, the doctor testified, under cross-examination, that one of the head injuries appeared to pre-date the others, and that testimony is consistent with the work-connected head injury which occurred two days prior to the fatal accident which also resulted in head injuries.
Further medical testimony was offered by Dr. Botting, a pathologist who examined the body; and, in response to a hypothetical which included the job-related head injury on Friday, followed by headache, nausea, loss of appetite, listlessness, difficulty with depth perception and grasping objects, forgetfulness, walking into the path of a truck, testified that the hemorrhage in the subdural space "could have been within 72 or 96 hours of the incident involving the truck," that it was "not really a very great degree of hemorrhage," and concluded:
A. [Dr. Botting] ... And I think it is certainly consistent with survival from a head injury on the 18th of February [Friday] and that it would have probably had led to some physical and mental impairment.
Q. What type of  could you give the deputy commissioner some examples of the type of behavior that would have been evidenced?
A. Well, confusion, impaired sensory, his difficulty with cigarettes, in reaching for objects, you know, this certainly suggests some sort of neurologic impairment.
*597 In the instant case, as in Jones v. Leon County Health Department, 335 So.2d 269 (Fla. 1976), there was evidence that the employee was suffering emotional distress as the result of family problems unrelated to his employment. In Jones, however, the court affirmed the deputy's finding that a drug being taken by decedent for tuberculosis contracted on the job "does have associated with it mental change in patients who take it" and, on that basis, found a causal connection between claimant's shooting himself and the work-connected injury. There, as here, there was aberrant behavior between the initial work-connected injury and the final, fatal event.
The evidence shows uncharacteristic behavior commencing following the work-connected injury and the deputy was entitled to find that the injury, rather than depression over personal problems, led to the death. In the instant case, the deputy was entitled to find that the head injury on the job resulted in visual problems, disorientation, and confusion, which led decedent to wander into the path of the truck.
Appellants here ask this court to disregard the testimony of the widow concerning decedent's behavior following the accident on the job and to deal only with the autopsy and the inability of the physicians to identify which head injury occurred on Friday and which occurred on Monday. In this regard, appellants' brief states that Dr. Botting's testimony was "that he could not say within reasonable probability that the blow on Ohmstede's head, however hard or slight it might have been, caused him to wander into the path of the truck three days later" and cites the record at page 288 for that statement. Review of the record on that page, however, shows that the doctor's testimony is unfairly characterized by appellants.[1] First of all, the question asked him to limit his answer solely to his own evaluation of the body in the autopsy, thereby disregarding the lay testimony concerning the uncharacteristic behavior of the employee following his work-connected accident. Second, the witness was interrupted in the middle of an answer, which indicated that a head injury, if it resulted in neurological impairment, could have caused the decedent to wander into the path of a truck three days later. Finally, the answer in response to the employer/carrier's own question was that "that kind of behavior is consistent with subdural hematomas." The witness was not required to testify that all persons with subdural hematomas would suffer the same types of effects, only that the decedent's behavior was consistent with a subdural hematoma.
The record, pages 305 through 306 and 313, shows continued questioning by the employer/carrier which limits the doctor to his examination of the body of the decedent without consideration of the history of bizarre behavior preceding the fatal accident. This testimony is relied on by appellants to show that the doctor could not say, within reasonable medical probability, whether the hematoma found in the autopsy was a result of the Friday or the Monday accident. However, examination of the record on those pages shows that, under cross-examination by the employer/carrier, the following occurred:
Q. (Interrupting) Isn't that just as logical [that injury occurred in accident with the truck] or even more so, if he didn't even get hit here on a Friday.
A. No, because the extent of the hemorrhage that was in the  in this portion down here on the skull  now, this is the inside of the skull in the right interior *598 fossa, it was kind of small. It was not of the same magnitude as the other head injuries, that's one thing.
The other thing is that this man had a history of bizarre behavior which is also 
Q. (Interrupting) There are other factors in his life accounting for that. Let's forget the bizarre behavior.

A. Okay.
Q. Let's talk strictly about the physical evidence on the body 
A. Right. (emphasis added)
Finally, at the page cited by appellants for the statement that the doctor could not say, within reasonable medical probability, which of the blows produced his hematoma, we find this testimony:
Q. [Attorney for Employer/Carrier] Well, absent this history of behavior, except for the  just going by the examination and assuming this abrasion wasn't there the day before he met his death, can you say beyond a mere medical possibility which of the blows to the head caused his subdural hematoma?
A. No, I can't. (emphasis added)
The doctor was not required to disregard the history and behavior of the deceased between the two accidents or the abrasion. Since the deputy chose to believe the testimony, primarily, of the widow concerning that behavior, it establishes a basis for finding that the accidents were connected causally. The behavior described is established by medical testimony to be "characteristic" of a subdural hematoma. Expert testimony is not required to establish the ultimate fact of the accident itself but only that this type of conduct is consistent with the injury suffered by the decedent.
The order of the deputy should be affirmed.
NOTES
[1] Testimony of Dr. Botting, record page 288:

Q. Other than dealing in the hypothetical, though, based upon your own evaluation of the body and the autopsy you performed, you cannot say within reasonable medical probability that this man's blow on the head, however hard or slight it might have been, on a Friday, caused him to wander in the path of a truck three days later?
MR. OLEWINSKI: Object to the form.
THE WITNESS: I think that a head injury if it did result in this neurologic impairment 
BY MR. SMALBEIN:
Q. Right.
But you don't know that it did? All you can say is that kind of behavior is consistent with subdural hematomas?